# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 27, 2011 Session

## STATE OF TENNESSEE v. JAMEL MARSH

### Appeal from the Criminal Court for Hamilton County
### No. 256992    Rebecca J. Stern, Judge

---

### No. E2010-00821-CCA-R3-CD - Filed September 17, 2012

---

Defendant-Appellant, Jamel Marsh, was convicted by a Hamilton County jury of voluntary manslaughter and received a sentence of four years in the Tennessee Department of Correction. On appeal, Marsh argues: (1) the trial court's method of selecting and qualifying the jury violated Tennessee Code Annotated sections 22-2-308 and 22-2-313 and as well as Batson v. Kentucky, 476 U.S. 79 (1986); (2) the trial court erred in preventing defense counsel from cross-examining Rachel Hixson about whether she received preferential treatment in her unrelated criminal cases in exchange for her testimony against Marsh and erred in preventing defense counsel from making an offer of proof regarding this alleged preferential treatment, thereby violating Giglio v. United States, 405 U.S. 150 (1972); and (3) his sentence violated Blakely v. Washington, 542 U.S. 296 (2004), and his sentence was excessive. Upon review, we affirm the judgment of the trial court and remand the case for entry of a corrected judgment to show that the jury found Marsh guilty of voluntary manslaughter.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Charles P. Dupree, Chattanooga, Tennessee, for the Defendant-Appellant, Jamel Marsh.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; Boyd M. Patterson, Jr., and William H. Hall, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

# FACTUAL BACKGROUND

On November 9, 2005, Marsh shot and killed the victim, Ricky White, at a duplex in Hamilton County. The shooting was witnessed by Rachel Hixson, Patricia Hixson, and Marsh's girlfriend, Lakeesha Featherstone, all of whom lived in the duplex. Marsh was charged with first degree premeditated murder and carrying a dangerous weapon. On February 4, 2008, at Marsh's first trial, the jury acquitted Marsh of the offense of first degree premeditated murder but could not agree as to Marsh's guilt or innocence regarding the lesser included offenses. The trial was continued to February 5, 2008, for the jury to continue to deliberate on the lesser included offenses. That day, the trial court dismissed the charge of carrying a dangerous weapon upon defense counsel's oral motion, and the jury was unable to agree on a verdict regarding the lesser included offense of second degree murder. Accordingly, the trial court declared a mistrial. Marsh's second trial began on June 30, 2009.

**June 30, 2009 Trial.** Marsh does not argue that the evidence was insufficient to support his conviction; therefore, we have briefly summarized the evidence presented at trial:

Rachel Hixson testified that at the time of the victim's shooting she lived in Apartment B of a duplex located at 210 Buena Vista Drive in Hamilton County, Tennessee. She said that she and the victim were romantically involved and often used drugs together. She also said that when the victim used drugs, he became abusive to her. On November 9, 2005, the day the victim was shot, Rachel[1] and her mother, Patricia Hixson, had been arguing because her mother had just obtained legal custody of Rachel's children. The victim told Rachel to stop screaming at her mother. Then Featherstone, their neighbor, knocked on the door to Rachel's apartment. The victim answered the door and asked Featherstone, "[W]hat[?]" This angered Featherstone, and she and the victim began arguing. Then Featherstone told the victim that someone needed to take care of him. She returned to her apartment and notified Marsh about her problems with the victim. Marsh walked to the front yard of the duplex and told the victim "to get his b[----] a[--] outside." The victim walked out of the house and into the yard. Marsh then returned to Featherstone's apartment, retrieved his gun, and walked back to the victim's yard.

Rachel said she saw that Marsh had a gun when he returned to the front yard. She then heard Marsh tell the victim that he was going to kill him. At the time, Rachel and the victim were standing just inside their apartment near the stairs. Featherstone, who was also standing in the yard, grabbed Marsh's arm and asked him what was he doing. Then Rachel told Marsh, "[D]on't, my kids are in the house." She then heard a "pow" sound, and she felt

---

[1]Because two of the eyewitnesses in this case share the last name of Hixson, we will address them by their first names for clarity.

blood on her. Rachel stated that the victim was unarmed at the time Marsh shot him. After being shot, the victim attempted to walk towards the kitchen. Rachel's mother, a nurse, ran to assist the victim, and Rachel ran down the stairs and called 9-1-1.

Patricia Hixson testified that she lived with Rachel Hixson and the victim in the duplex located at 210 Buena Vista Drive at the time of the shooting. Patricia said that on November 9, 2005, at approximately 7:45 a.m., Featherstone's son came over to their apartment to ask her if she could drive Featherstone to school. As Patricia agreed to give Featherstone a ride, Rachel walked downstairs and offered to drive Featherstone herself. Patricia told Rachel to buy groceries for the family instead of driving Featherstone. At that point, Patricia and Rachel began arguing about Rachel's propensity to spend money on drugs rather than groceries for her family. Patricia said Rachel was already angry with her because she had just obtained custody of Rachel's children. During the argument, the victim came downstairs and told Rachel to stop arguing with her mother. The victim then sat down in a rocking chair near the front window of the apartment. When Featherstone knocked on the door to their apartment, the victim yelled, "[W]hat[?]" He opened the door, and Featherstone began arguing with him for being disrespectful to her. The argument escalated, and the victim told Patricia to take Featherstone to school to get her out of the apartment.

Patricia heard Featherstone yell for Marsh and then heard the storm door to Featherstone's apartment open and close. Marsh walked over to the Hixsons' front yard and screamed for the victim to get his "b[----] a[--] out here." The victim "pushed past" Patricia, walked onto the porch, and told Marsh, "[I]f we're going to get it on let's get it on." Patricia said that the interaction between Marsh and the victim was unusual because neither of the men was screaming at each other. Patricia told Rachel to get her keys so that Patricia could get Featherstone out of the apartment.

Patricia said that she heard Marsh say something to the victim before going inside Featherstone's apartment but did not hear what he said because she was talking to Rachel at the time. The victim returned to the apartment and demanded that Patricia take Featherstone to school. At that point, Featherstone began pushing against her and screaming at the victim. Patricia heard Featherstone say to the victim, "[Y]eah, go on in there and get a knife." Then the victim informed Featherstone that he was going to the kitchen to get some tea, and he opened the refrigerator. Featherstone yelled at the victim that someone ought to beat his "a[--]." She then told him, "I'm going to get somebody to beat your a[--]." At that point, Patricia was still blocking Featherstone from entering the house. Then Featherstone began screaming for Marsh. Featherstone ran over to her apartment, and then Patricia heard Featherstone's apartment door open and saw Marsh exiting the apartment carrying a gun.

Patricia said Marsh walked to her front yard and raised the gun. Then she heard Featherstone yell, "[N]o." Patricia said she was fairly certain that Marsh would not shoot her. When Patricia moved to get out of the way, she heard Marsh fire the gun and heard the bullet travel past her. She then heard Rachel scream that someone had been shot. Featherstone yelled at Marsh, ["L]ook what you've done.["] Patricia said she saw Marsh and Featherstone walk away and observed blood near her step. She looked at Rachel, who had blood on her, and then looked at her "grandbabies [sic] sitting in the floor looking at their daddy [with] blood spurting everywhere." Patricia grabbed Rachel and yelled at her to call an ambulance. Patricia ran to the victim and tried to drag him into the kitchen so that her grandchildren could not see his gunshot wound. Patricia said that she attempted to help the victim before he died in her arms. She also denied that the victim had a knife in his hand prior to being shot. When Patricia returned to her apartment the next day, she found a box cutter on the floor covered in blood.

Marsh testified that he often stayed with Featherstone in Apartment A of the duplex located at 210 Buena Vista Drive at the time of the victim's death. He said that the victim had "an anger problem, [with] a lot of rage and aggression towards his family[.]" On November 9, 2005, Marsh was awakened by Featherstone screaming. Marsh grabbed his gun and walked outside to see what was happening. He saw Featherstone screaming at the victim, and he walked over to her in the yard. Marsh saw the victim standing in the doorway, and he yelled at the victim to "bring his b[----] a[--] in the yard" so they could fight. Marsh said that the victim appeared as though he did not want to fight, and Marsh started walking back to Featherstone's apartment. Marsh saw the victim walk onto the porch and begin arguing with Featherstone again. Marsh observed the victim fumbling with something in his back pocket, and he asked the victim, "[Y]ou got a knife, you going to stab me[?]" At that point, Marsh said that the victim threatened to kill him. Marsh pulled out his gun and held it next to his side, believing that the display of his gun would end the argument. The victim continued to tell Marsh that he was going to kill him and then pulled out his box cutter knife, opened it, and began walking towards him. When the victim continued to walk towards him, Marsh fired a single shot from his gun.

On July 8, 2009, at the conclusion of Marsh's second trial, the jury found him guilty of voluntary manslaughter. The trial court subsequently sentenced Marsh as a Range I, standard offender to a four-year sentence in confinement and awarded him pretrial jail credit for the period from November 9, 2005, to May 22, 2006. Marsh subsequently filed a timely motion for new trial, which the court denied. He then filed a timely notice of appeal on April 12, 2010. On June 16, 2010, the trial court signed an amended judgment with an entry date of December 7, 2009, awarding Marsh additional pretrial jail credit for the period from December 7, 2009, to June 16, 2010. Although the original judgment correctly reflected that the jury had found Marsh guilty of voluntary manslaughter, the amended judgment

erroneously showed that Marsh had entered a guilty plea to this offense. Accordingly, we remand this case to the trial court for entry of an amended judgment showing that the jury found Marsh guilty of voluntary manslaughter.

**ANALYSIS**

**I. Jury Errors.** Marsh makes several sweeping assertions that the trial court's method of selecting and qualifying the jury violated Tennessee Code Annotated sections 22-2-308 and 22-2-313 as well as Batson v. Kentucky, 476 U.S. 79 (1986). He argues that the trial court's "method of selection, where the no-show jurors were not investigated and the jurors who self-selected out were allowed to 'sit out' [of] the selection process limit[ed] the possibility of a fair and impartial jury" and resulted in a jury with few African-Americans. In response, the State argues that Marsh has waived this issue because he failed to cite to the record and failed to cite to legal authority supporting his arguments. See Tenn. Ct. Crim. App. R. 10(b). The State further argues that the trial court properly overruled Marsh's Batson objections because the State provided non-discriminatory reasons for the use of each of its peremptory challenges.

We agree with the State that Marsh failed to support his argument with appropriate and adequate citations to legal authority. Although Marsh claims that Tennessee Code Annotated sections 22-2-308 and 22-2-313 were violated, he does not explain how the trial court violated these statutes. Code section 22-2-308 discusses the publication of jury pool lists, and code section 22-2-313 provides that in the absence of fraud, all jury verdicts will be upheld unless an objection is made before the jury is sworn. We fail to see how either of these code sections are in any way supportive of Marsh's arguments. Moreover, Marsh mentions Batson v. Kentucky in his statement of the issues presented for review but fails to cite Batson or explain its relevance to his arguments in this case. Consequently, we conclude that Marsh has waived all issues regarding the selection and qualification of the jury because he failed to cite to supporting legal authority. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Tenn. R. App. P. 27(a)(7). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Based on the foregoing, Marsh's issues regarding the selection and qualification of the jury are waived.

**II. State's Alleged Preferential Treatment to Rachel Hixson.** Marsh also argues that the trial court erred in preventing defense counsel from cross-examining Rachel Hixson

about whether she received preferential treatment in her unrelated criminal cases in exchange for her testimony against Marsh and erred in preventing defense counsel from making an offer of proof regarding this alleged preferential treatment, thereby violating Giglio v. United States, 405 U.S. 150 (1972). Marsh claims that the preferential treatment by the State is evidenced by the State's suspension of Hixson's drug cases, its dismissal of her other criminal charges, and its refusal to pursue her probation violations.

The State responds that Marsh has waived this issue because he failed to cite to the record and failed to cite to legal authority supporting his argument. See Tenn. Ct. Crim. App. R. 10(b). Waiver notwithstanding, the State asserts that Marsh has failed to establish a violation under Brady v. Maryland, 373 U.S. 83 (1963), because the record is devoid of any evidence indicating that the State had an agreement with Hixson in exchange for her testimony against Marsh.

Although we do not agree that Marsh failed to cite to the relevant portions of the record on this issue, we do agree with the State that Marsh failed to support his argument with adequate citations to authority. Marsh cites a single case, Giglio v. United States, 405 U.S. 150 (1972), in support of his argument. In Giglio, 405 U.S. at 155, the United States Supreme Court held that the prosecution, pursuant to Brady, has a duty to disclose evidence impacting the credibility of a government witness, including evidence of an agreement or a promise of leniency given to the witness in exchange for the witness's favorable testimony against a defendant. We note that Marsh glaringly fails to cite specifically to Brady and its progeny. Moreover, Marsh fails to prove by a preponderance of the evidence the following four prerequisites necessary to establish a due process violation under Brady:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995) (citing State v. Evans, 838 S.W.2d 185 (Tenn. 1992); State v. Spurlock, 874 S.W.2d 602 (Tenn. Crim. App. 1993); Workman v. State, 868 S.W.2d 705 (Tenn. Crim. App. 1993); State v. Marshall, 845 S.W.2d 228 (Tenn. Crim. App. 1992); Strouth v. State, 755 S.W.2d 819 (Tenn. Crim. App. 1986)).

Waiver notwithstanding, the record, including the documents attached to the motion for new trial, does not establish that preferential treatment was given to Rachel Hixson or that an agreement existed between the State and her in exchange for her testimony against Marsh. The attached documents all relate to a single theft charge. They show that Hixson entered a plea of guilty to theft of property valued at less than $500 on September 25, 2006, and that she received a suspended sentence of eleven months and twenty-nine days that included six months of drug screens. The documents also show that she was ordered to complete ten days of community service, that she violated her probation one time for failing to report to her probation officer, and that she was later ordered to complete the remaining days of community service for the theft case. Finally, the documents show that Rachel failed a single drug screen. These documents do not prove the existence of preferential treatment or a prior agreement with the State. Accordingly, Marsh is not entitled to relief on this issue.

Second, Marsh argues that the trial court erred in failing to require the State to provide Lakeesha Featherstone's current address to the defense in a timely manner. He claims she would have provided favorable testimony regarding the defense's theory of self-defense. He also argues that the trial court erred in denying the defense's request to have Featherstone's statement to police admitted into evidence and read to the jury, given that she was arguably unavailable at trial. The State argues that Marsh has waived this issue because he failed to cite to the record and failed to cite to legal authority supporting his argument. See Tenn. Ct. Crim. App. R. 10(b). Although we do not agree that Marsh failed to cite to the relevant portions of the record, we do agree with the State that he failed to support his argument with any citations to authority. See id.; Tenn. R. App. P. 27(a)(7). Accordingly, this issue is waived. See Hammons, 737 S.W.2d at 552.

**IV. Sentence.** First, Marsh argues that his sentence was imposed in violation of Blakely v. Washington, 542 U.S. 296 (2004). The State responds that Blakely is not applicable to this case because the offense in this case occurred after June 7, 2005, the effective date of the amended sentencing act. We agree.

On June 24, 2004, the United States Supreme Court held in Blakely that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" Blakely, 542 U.S. at 301 (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)). On June 7, 2005, following Blakely, the Tennessee legislature passed a new sentencing law eradicating presumptive sentences and establishing advisory sentencing guidelines. Under the new sentencing law, "the trial court 'shall consider, but is not bound by' an 'advisory sentencing guideline' that suggests an adjustment to the defendant's sentence upon the presence or absence of mitigating and enhancement factors." State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2008) (quoting T.C.A. § 40-35-210(c) (2006)).

Marsh committed the offense in this case on November 9, 2005. The Compiler's Notes to the amended Tennessee Code Annotated section 40-35-210 (2006) state that the amended sentencing act "shall apply to sentencing for criminal offenses committed on or after June 7, 2005." Because Marsh committed his offense after the June 7, 2005 deadline, he was sentenced under the 2005 amendments to the sentencing act, thereby making Blakely inapplicable.

Second, Marsh contends that the trial court erred in denying him judicial diversion, an alternative sentence, and split confinement, given that he had no criminal history and had served approximately one year in jail prior to sentencing. The State responds that Marsh was ineligible for judicial diversion under the applicable statute but fails to provide argument regarding the other sentencing issues raised by Marsh.

We conclude that Marsh has waived these sentencing issues because he failed to cite to relevant portions of the record and failing to support his argument with citations to legal authority. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7); Hammons, 737 S.W.2d at 552. Upon review, we affirm the judgment of the trial court and remand the case for entry of a corrected judgment to show that the jury found Marsh guilty of voluntary manslaughter.

_____
CAMILLE R. McMULLEN, JUDGE